# DECLARATON OF JOHN VAN WU

I, John Van Wu, am over the age of 18 and fully competent to make the following declaration:

(1) I am 51 years old.  I suffer from chronic lung disease with Asthma, and must use 2 types of medication inhalers 2 to 3 times a day.  I also have Type 2 Diabetes Mellitus, high blood pressure, and high lipidemia with an increased risk of Coronary Artery Disease (CAD).  Since my incarceration, I have been treated for respiratory infection 4 times.  In the event I contract COVID-19, it is likely this severe virus will result in DEATH.  Memorandum from Attorney General William Barr to Director of Bureau of Prison, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020).  Subsequent to the Attorney General's Memorandum on May 8, 2020, the DOJ acting Assistant Director of the Correctional Program Division and the Assistant Director of Reentry Service Division issued a memorandum for Chief Executive Officers/Wardens about home confinement.  "In our continued effort to protect the health and safety of staff and inmates during the COVID-19 Pandemic, it is imperative to review at-risk inmates for placement on home confinement".  Inmates for whom the B.O.P./Warden has refused to file such a motion may now file their own 18 U.S.C. 3552(c)(1)(A) motion with the {original sentences court} when the B.O.P./Warden has either denied their request or after 30 days have passed without a decision.

2)  I have compiled proof of evidence in this matter to show that I have exhausted full Administrative Remedies.  On April 2, 2020, I sent a handwritten letter to the Warden seeking compassionate release and transfer to home confinement due to my existing medical illnesses and high risk of mortality upon contracting COVID-19 (See Exhibit A).  On April 10, 2020, I sent a follow-up "Inmate Request to Staff" to the Warden, Administrative Director Thomas, Assistant Warden Tuckers, and Case Manager Cedeno seeking compassionate release.  On May 3, 2020, receiving no response after the 30 days had passed, I typed a letter to the Warden explaining in detail my medical illnesses in support of a request for compassionate release.  I have also filed BP-229 (9) Administrative Remedy after the Warden's denial letter.  But this was not until the Warden's denial letter was requested upon by the prosecutor and sent to my legal counsel.  On May 19, 2020, I followed up with filing BP-230 (13) given from the regional director.  After receiving the Administrative Remedy denial letter on June 4, 2020, I filed a final remedy to the Regional Director of the Federal Bureau of Prison at North Central Regional Office Gateway Complex, Tower II, 8th floor, 400 State Avenue, Kansas City, Kansas 66101-2497.  Thus, I have proven that I have fully exhausted all Administrative Remedies on June 15, 2020.  I trust that what I have stated will satisfactorily address the argument of failure to exhaust administrative remedies and that the court will address the substance of the issues raised and grant compassionate release and/or home confinement as the court deems best under the circumstances.

3)  The question we should consider is: Should we wait until COVID-19 arrives at the door, at which point it would be demonstrably too late, before we begin to take precautionary action?  In my specific situation, the threat is particularly devastating.  It has come to my knowledge that the B.O.P. has over 136,000 federal inmates under custody, of which over 8,000 inmates have

Replacement Exhibit A
to Renewed Motion for
Compassionate Release

contracted COVID-19, and more than 100 cases within the federal prison population have resulted in death.  Furthermore, I am aware of the fact that there are more than 3,000 active cases spreading across 85 B.O.P. facilities, including the FCI/FPC Englewood facility where I am currently incarcerated.  It has been complete chaos since COVID-19 began to spread inside FDC/FCI Englewood.  Currently, there are 7+ inmates who have contracted COVID-19 and over 90 inmates at FDC who are currently under quarantine.  These numbers are from Medical Staff Cordova's response when the inmates questioned him about the situation at the medication/pill line on July 13, 2020.  According to conflicting reports from the BOP.gov website, there are only 5 reported inmates experiencing active COVID-19 symptoms, not the 7 inmates reported by nurse Cordova.  This shows that there are discrepancies in the B.O.P.'s reporting.  Please refer to Journal of American Association on July 10, 2020.  I have requested to be tested for COVID-19 on 3 separate occasions but the staff refuses to perform the test.  They state that the facility's policy says that there are not enough testing kits for inmates, unless the inmates are symptomatic.  In that light, other facilities, where wide-spread testing has occurred, have shown that the infection rate has reached upward to 75% more than the normal population.  Therefore, one should not put much faith in the B.O.P. numbers and much less on its claim that it can contain the virus in the B.O.P., overall or in this facility specifically.  Additionally, the New York Times has reported that the spread of COVID-19 in U.S. penal institutions was up 74% from May to June.

As of right now, while I am writing this to you, COVID-19 cases are once again on the rise in our nation, with 45 states making it mandatory to wear masks.  The Englewood facility has two (2) components, the FCI and the FPC.  Camp personnel routinely work at both facilities.  As such, it is not inconceivable that one or more B.O.P. personnel could contract the virus outside or from other parts of the facility and bring such to the camp.  The so-called "reasonable and effective steps..." have proven to be ineffective at other B.O.P. facilities and likewise ineffective at other parts of the facility, and COVID-19 WOULD UNDOUBTEDLY SPREAD ONCE IT ARRIVES AT THE CAMP ITSELF.  Medical experts such as Dr. Fauci and the CDC have stated correctly that this prison environment is like a "Petri dish", very favorable to the spread of the virus.

I am currently in a facility where I am in constant contact with over 100+ inmates within my vicinity and B.O.P. personnel on a daily basis without any possibility of social distancing or PPE.  As I have stated earlier, B.O.P. personnel go back into the community everyday and work at other parts of the facility where there have been numerous positive cases of the virus.  Under home confinement/Compassionate Release, I will be able to maintain social distancing and will be in considerably more control of the people I am in contact with preventing me from the possibility of DEATH.  This brings us to a related critical point, which may literally mean the difference between life and death: the inadequate medical care provided at the facility.  The B.O.P. has no credible plan to deal with an outbreak at any of its facilities as evidenced by the outbreaks and concomitant fatalities that have occurred at Oakdale, Elkton, Lompoc, Fort Worth, and other facilities where the virus has spread like wildfire once it has secured a foothold.

If someone is sick or has a fever, they need to fill out a COP-OUT request form.  Then they have to wait at least 4 to 7 days or longer to receive an appointment, depending on how full the schedules of Dr. Oba's 2 nurses or his 2 medical assistants are.  To see Dr. Oba, we have to wait longer than 7 weeks to get an appointment (see attached COP-OUT form).  After you have been seen by a health care provider and they check that you have a fever, the staff automatically puts the inmate into isolation but refuses to conduct a COVID-19 test unless the inmate is symptomatic or severely ill.  This makes it intimidating to the inmatest to report their sickness, unless they are symptomatic, because they would have to face isolation.

At the FCI/FPC Englewood facility, a single town hall meeting was held on April 2, 2020 concerning the spread of the COVID-19 infection.  The meeting took place at the Camp meeting room where B.O.P. personnel informed that in the event an inmate contracts COVID-19:

> 1) Inmate would be quarantined in a separate room for 14 days, yet share the same recycled air vent and central HVAC with the rest of the 100+ inmates at the Camp.
> 2) Inmate will be given water or IV fluid for hydration as needed.
> 3) Inmate will be given basic anti-inflammatory medication like Ibuprofen or Naproxen for fever or pain.

There are no medical treatments or plans on the part of the B.O.P. to send inmates to the hospital in the event they are positive of a COVID-19 infection or symptomatic.  There is also no other credible plan to provide effective treatment to infected inmates.  In my case, it might as well represent a death sentence given my highly elevated risk due to my medical conditions and the close quarters in which 3 to 5 inmates are kept in each cell.

Everywhere we go, we are all in close proximity with one another, so staying socially distant is impossible.  This is true throughout the facility—next to the phones; near the computers; in the dining hall, the TV room, the showers, and even the hallways we all walk through.  All the beds are placed either right next to one another or are bunk beds, so we are not physically able to maintain distance within our cells.  There are only 4 phones and 6 computers shared by everyone, and these devices are not cleaned in between uses.  Both the phones and the computers are less than 2 feet apart from each other and are always in constant use.  Also, in order to use these devices, we must wait in a long line, and therefore it is not possible for me and the other inmates to practice social distancing.

When I was transferred to Englewood Camp, B.O.P. provided me with a generic bar of soap.  And 2 weeks later, I ran out of soap.  I requested for an additional soap bar, but I was told by the B.O.P. personnel that I would have to purchase my own at the commissary.  There are no dispensers for soap or hand sanitizer anywhere in the unit.  Furthermore, in order for me to receive my necessary medication, I must wait at least 4 weeks.  Therefore, I am left to suffer through my medical conditions or illnesses without any medication.  The B.O.P. is not doing anything in particular to protect people with high risk comorbidity.  Nothing is being done to separate people who are older or with higher risk conditions, such as myself.  They have only

sent out memos telling inmates to maintain social distancing and to wash our hands.  I am sure they know that this is impossible at the Englewood Camp.

Everyday over 100+ inmates line up in the hallway, which is 4 feet in width, bunched up right behind each other to pick up our breakfast, lunch and dinner.  There is no social distancing.  Food is packaged in a paper bag or in a white styrofoam disposable box.  There is no place where we can eat without bumping right up against each other.  Additionally, there are no plastic shields between the B.O.P. staff and inmates during meal distribution or medication distribution.  On many occasions, the B.O.P. staff did not wear a mask or PPE, and they would come within 3 or less feet of distance with inmates.  The poor ventilation and filth in the vents has not been cleaned.  Our cell measures 8 by 11 feet, each containing 3 bunk beds for 3 to 5 men.  In this space, there is no way for us to keep the six foot distance.  Our beds are so close and stacked on top of each other that we are overcrowded into these rooms like cattle.

Moreover, without belaboring the point, it is well known that the medical care provided at the Englewood facility is less than optimal.  This is a reflection of the under-qualified medical staff at the facility along with B.O.P. policy of not expending resources on medical care for inmates.  For example, within a few months of arriving at the Englewood facility, an inmate Lucero died in his room for lack of adequate medical care.  After considerable delay in taking the inmate to the hospital, he was finally hospitalized and diagnosed with a bleeding ulcer and possible stomach cancer.  He was not allowed to stay in the hospital for a full evaluation, because it is B.O.P. policy not to expend resources on extended hospital stays for inmates.  Within two (2) weeks of being brought back, he bled out of both ends in his room and died.  B.O.P. personnel called an ambulance, unsuccessfully tried to revive him, and then put him in the ambulance even though he was already dead.  Medical staff pronounced him dead in the ambulance in the parking lot of the facility.  Thus, it could be said that he died en route to the hospital.  This charade was in conformity with B.O.P. policy of keeping down the number of reported deaths at B.O.P. facilities.

Likewise, an elderly inmate (Edward Lee Donnes #02911-046) recently went to Sick-Call for an abscessed tooth that had gone untreated for several weeks.  Edward had been cleaning and maintaining the FDC facility where the 90 inmates are under quarantine.  Within the next day of returning from the FDC, Edward was coughing up and excreting blood.  Notwithstanding that his jaw and mouth were swollen due to the infection, he was berated, ignored and sent back to his room.  Less than 12 hours later, he had a massive Heart Attack and had to be taken immediately to the hospital for open heart surgery.  The untreated infection in his mouth had spread through his body.  He is still in the ICU, but we do not know the results of the operation or his possible return date to the Camp facility.  No one at Englewood is willing to be transparent and update us about what has happened to Edward.  There are several other examples, but I do not want to belabor the point.  The issue is that contrary to B.O.P. priorities, I have legitimate reasons to fear for my life due to COVID-19 and the lack of medical care provided at the Englewood Facility.  Given the demonstrated lack of adequate medical care and time delay, which takes several months to see a doctor or even get a blood test, to keep me incarcerated here under the current medical condition is akin to playing Russian Roulette with my life.  These are just a few of the 30 other medical negligence at the Englewood Facility.

Lastly, I would like to share my day-to-day experience of what it has been like with COVID-19 at Englewood.  When the guards come to work they must go through a temporary checkpoint, which I can see from my window.  For the most part there is some staff there to take their temperature.  However, when there is a shift change and no guard is on duty at 8 AM and 4 PM, the staff would pass the checkpoint without a temperature check.  There are several spots around the compound where the staff can get in without going through a checkpoint.  On another note, the inmates that are being released or transferred to a halfway house would be transported by a camp inmate to a drop off point at the airport, the Greyhound bus station, or a halfway house.  This inmate would interact with the public and the community then return back to our facility.  Because of this interaction, they could potentially infect the rest of the camp inmates.

It is a tragedy to see that some staff members do not wear gloves or a mask when giving out Insulin and medications to inmates.  I try to avoid contact with most of the staff when they come into our cells, yet 2 staff members would come into the room and do counts at 10 AM, 4PM, 9 PM, midnight, 3 AM and 6 AM which is unavoidable.  There are also camp inmates who go to the FDC to work.  They would clean the bathrooms and common area, mop the floor, and cook food in close contact with inmates who have tested positive for COVID-19, and the working camp inmates would be exposed to the same air ventilation.

4)  At FCI/FPC Englewood, there have been little measures taken to quarantine the inmates that are haphazardly, at best and at worst, providing a false sense of security to the staff and inmates thereby enabling the virus to spread more easily upon outbreak.  On July 18, 2020, Englewood personnel provided us with three new masks.  This heightens my concern about COVID-19 within the facility, as why would they hand out masks unless the issue has gotten more serious.  The poor and non-existent medical treatment at Englewood consist of too many violations under the quarantine measure to count.  Health service here is already overwhelmed with chronically ill inmates at the Englewood facility such that I cannot get timely medical care.  It is clear that the understaffing has its hands full with more than a thousand inmates behind bars who need constant medical attention with only 1 physician, 2 nurses, and 2 medical assistant staff to provide them with medical care.  In the alternative, should the institution be unable to place me in the Priority Group of Camp non-violent inmates being transferred to home confinement due to understaffing, then I would request a Reduction in Sentence (RIS) motion be granted on my behalf by B.O.P. pursuant to 18 U.S.C. 3582(c)(1)(A)(i) due to the [extraordinary and compelling circumstances] of the COVID-19 Pandemic and the extremely high risk of mortality I will face if infected.  These extraordinary and compelling circumstances were unforeseen, even unforeseeable at sentencing and due to the "Petri dish" conditions in prison, I ask that you warrant a (RIS) Motion for Compassionate Release to be granted on my behalf.  It would be devastating to my 4 young children if I were to contract COVID-19 and DIE, leaving them fatherless.

Your Honor, I have accepted responsibility for my past and I have been a model inmate at Englewood facility for the past 15 months that I have served.  The B.O.P. has recently released

that my Pattern Scoring was less than zero (0).  Through data, the B.O.P. used scientifically based factors that predicts inmates, like myself, with low or no risk of recidivism.  I am part of an Impact program for my fellow inmates at the Englewood facility and also volunteer my time for the Inmate Suicide Prevention Program (see attached certificate).  I also promote an inmates' education program and help inmates prepare for reentry into the community.  I am not trying to minimize my sentencing, but I am asking that you and the B.O.P. look at all the information and my conduct during prison and what has been documented of me in the B.O.P. and give me an opportunity to return to my family, so that I can continue to be a productive citizen to my community.  I also ask that you take into consideration the family I could lose from the COVID-19 Pandemic and the time that I have lost with my children missing my daughter's 15th and 16th Birthday celebration and all of her accomplishments, since I have entered prison.  I understand that you and I are both experiencing this global pandemic at the same time, so I ask that you sympathize with me under the extraordinary and compelling circumstances we are all going through.  I humbly ask that you look with favor upon my petition and grant for compassionate release and reduction in sentence, thereby saving my life and returning me to my loving family and my community.  I thank you greatly for your kind consideration of this petition and release me to home confinement to protect my health and well-being.

Most Gratefully,

/s/ John Van Wu (by consent)

_____
JOHN VAN WU# 44803-013