IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 18-cr-00293-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JOHN VAN WU

    Defendant.

---

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR COMPASSIONATE RELEASE**

---

The defendant lied about medical diagnoses and treatments for years to advance his own financial self interest and used his medical license to add a venire of respectability to his decision to trade oxycodone prescriptions for cash during the opioid crisis. When caught, he obstructed a grand jury investigation. When convicted, he called the jury's verdict a mockery. Now, after serving only about 36% of his sentence he makes unverified statements about his own health in a Renewed Motion for Compassionate Release seeking a sentence of time served. ECF No. 175 (hereinafter, the "Def. Mot." or the "Motion"). As set forth in more detail below the defendant's Motion should be denied. He has not presented extraordinary or compelling reasons for release and releasing him would undermine the statutory purposes of federal sentencing.

**I.     BACKGROUND:  BOP'S COMPREHENSIVE RESPONSE TO COVID-19**

    **A.     The System-Wide Response**

1

In response to the COVID-19 pandemic, BOP has taken significant measures to protect the health of the inmates in its charge, which is one of its highest priorities. As set forth in the Declaration of Stacy Collins attached here as **Exhibit 1,** on March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities, including at the defendant's facility. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis. Under the phase of the Action Plan currently in effect, only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure, risk factors, and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C.

§ 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

    **B.**    **The Implementation of These System-Wide Precautions at FCC Englewood**

FCI Englewood has implemented the plan described above. Exhibit 1 at ¶¶ 8 and 64. Its specific response is detailed in paragraphs 9 – 37 of Exhibit 1. These thoughtful and professionally executed measures have had the intended results. As of the August 5, 2020 **no** inmates at FCI or FPC Englewood were currently positive for COVID-19. Exhibit 1 at ¶39.[1]

---

[1] The BOP's website notes that there have been 5 confirmed cases at Federal Correctional Institute (FCI) Englewood. This is true, but only because the number on the website lumps

This fact alone — that FCI and FPC have been kept COVID-19 at bay for months — is strong evidence contradicting the defendant's broad allegations that his imprisonment puts him in unique danger.

## II. LEGAL BACKGROUND: THE CARES ACT AND COMPASSIONATE RELEASE

The government assumes for the sake of this motion that the defendant has fully exhausted his administrative remedies or that at least 30 days have passed since his petition was received by the warden. However, even then, the Court may grant the defendant's motion for reduction of sentence only "if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Further, the proposed sentencing reduction must be consistent with "the factors set forth in section 3553(a)." *Id.* In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (unpublished). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (unpublished) (citations omitted).

---

together all of the facilities that make up the entire Englewood complex, which includes the low-security FCI for sentenced prisoners, Federal Detention Center (FDC) for pretrial detainees, and the Federal Prison Camp (FPC). The 5 cases were at the FDC, which is not where the defendant is being housed. See https://www.bop.gov/coronavirus/index.jsp.

The defendant's ability to bring a motion for release under Section 3582 was created by the First Step Act's amendments. The statute previously allowed such a motion only by the Bureau of Prisons. Aside from allowing prisoners to bring motions directly, however, the First Step Act did not change the substantive requirements for compassionate release. As was the case before the First Step Act, the rules for allowing release appear in the Sentencing Commission's policy statements, as directed by Congress in 28 U.S.C. § 994(t). Thus, the Application Notes to U.S.S.G. § 1B1.13, "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)," define "extraordinary and compelling reasons." [2]

There are four categories of circumstances that can be deemed extraordinary and compelling: (1) terminal or serious medical conditions that "substantially diminish" a defendant's ability to provide self-care and from which the defendant is not expected to recover, (2) serious physical and mental deterioration suffered by defendants who are sixty-five or older

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

6

and who have served at least 10 years or 75% of his sentence, (3) the death or incapacitation of a caregiver for minor children of a spouse in circumstances where the defendant is the only available caregiver, and (4) "other reasons" determined by the Director of Prisons, which are set forth in Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/ 5050_050_EN.pdf (last accessed August 7, 2020).  U.S.S.G. § 1B1.13 Application Notes 1(A) – (D).

### III. THE DEFENDANT HAS NOT MET HIS BURDEN TO SHOW AN EXTRAORDINARY AND COMPELLING REASON FOR RELEASE

The defendant does not argue that he qualifies for release under categories 2, 3 or 4. Instead, he argues that he falls under the first category because he ▓▓▓▓▓▓▓▓ which is one of the conditions identified by the Centers for Disease Control as a risk factor for severe illness and because he has ▓▓▓▓▓▓▓▓ Def. Mot. at 3.[3]

---

[3] The defendant's motion correctly notes that the government takes the position that people with one of the CDC's risk factors present an extraordinary and compelling reason for compassionate release.  However, the defendant bears the burden of showing that he actually suffers from one of the risk factors.  Furthermore, because the Department's position as to what constitutes extraordinary and compelling circumstance is based on the developing medical information, and because that medical information is routinely updated, so is the government's position. For example, early CDC guidance noted that ▓▓▓ was a risk factor.  But updated guidance from July 17, 2020 reflects the current prevailing view that only ▓▓▓▓▓▓ is a concern and even then only one that "might" result in increased risk (as opposed to a

However, as set forth below he has provided scant evidence for these claims or for the additional conclusion that his conditions are extraordinary and compelling. *Cf. Heromin*, 2019 WL 2411311, at *2 (noting that defendant bears the burden and denying defendant's request where bulk of motion "rests on his self-diagnosis" with no other corroborating documentation).

There is no independent evidence that the defendant has a diagnosis of ▓▓▓▓. The defendant references ▓▓▓ for support, but ▓▓▓ simply relays the defendant's unverified, uncorroborated, and unsworn statement that he is ▓▓▓▓▓▓▓▓▓▓▓. The defendant repeats the same assertion in his declaration, but provides no documentation or other objective evidence of the condition.

As reflected by the jury's verdicts in this case, the defendant has a history of using his medical education to provide a venire of legitimacy to statements about health care matters that are self-serving but ultimately not true. The objective evidence that does exist in this matter — the defendant's medical records from the Bureau of Prisons — show that a diagnosis ▓▓▓▓ is denied. [Exhibit 1 at 31, 44, 51, 73, 79]. Taken together, the evidence shows that the defendant is once again using his medical education and former status as a doctor to make

---

separate category that is more definitively at risk. ▓▓▓▓▓▓ also falls in this more qualified category of conditions that "might" increase someone's risk. *See https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html*. Where a condition falls in the "might" category the government's position, consistent with the law, is that the defendant bears the burden of showing that his particular conditions rise to the level of extraordinary and compelling.

8

statements about medical matters that are grounded more in his self-interest than in objective diagnostic truths.

The same is true of the defendant's claim of ▓▓▓▓▓. The defendant's medical records deny any such diagnosis. [Exhibit 1 at 31, 44, 51, 79]. Even if they did, this is not categorically a high risk factor. Rather, the CDC has indicated that it is one that "might" cause an increased risk. Even then, when you click on the link for ▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓ Nor has he submitted evidence showing that his ▓▓▓▓▓ "substantially diminishes" his ability to provide self care. In previous letters to prison officials he asserted he had "Coronary Artery heart disease (CAD)." [Exhibit 1 at 105, 113 (¶3), 116, 117]. There is no evidence of that in his medical records. [Exhibit 1 at 73.]

The ▓▓▓▓▓ is more factually complicated, but not in a way that makes it medically extraordinary or compelling. Unlike ▓▓▓▓▓, the defendant made no mention of ▓▓▓▓▓ in the ▓▓▓▓▓ But he did report concerns about ▓▓▓▓▓ to prison medical authorities and has since received a formal diagnosis. [Exhibit 1 at 26, 30, 41, 51, 73, 79]. ▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓

Case 1:18-cr-00293-RBJ Document 181 Filed 08/07/20 USDC Colorado Page 10 of 16



In short, the defendant has not met the burden of showing that his circumstances are so extraordinary and compelling as to support compassionate release. COVID-19, by itself, is not enough. *See* ; *Raia*, --- F.3d ---, 2020 WL 1647922, at \*3 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Korn*, 2020 WL 1808213, at \*6 (W.D.N.Y. April 9, 2020) ("[I]n this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prison will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."). Absent additional evidence, the defendant's mere assertion that he has ▮▮▮▮ is also not enough. And, finally, without any evidence of a description of how they "substantially diminish" his ability to provide self-care, ▮▮▮▮ are also insufficient. *Cf United States v. Gaston*, 2020 WL 3287977, at \*3 (E.D. Mich. June 18, 2020) (denying claim based on ▮▮▮▮); *United States v. Washington*, 2020 WL 1969301 (W.D.N.Y. Apr. 24, 2020) (noting that a "generalized claim of ▮▮▮▮, without more, is not a sufficiently extraordinary and compelling reason for a sentence reduction[.]"); *United States v. Wood*, 2020 WL 3162944, at \*2 (E.D. Tenn. June 12, 2020)

10

(denying release based on ▓▓▓▓▓▓▓ and noting that if it did otherwise "the Court, to be evenhanded, would face the untenable situation of having to release all prisoners with any underlying condition."); *United States v. Ram*, 2020 WL 3100837, at *2-3 (W.D. Ark. June 11, 2020) (concluding that defendant with back pain, high blood pressure, high cholesterol, glaucoma and a claim that he was near "diabetic levels" did not present extraordinary and compelling reasons for release).

### IV. EVEN IF THE DEFENDANT'S SITUATION WAS EXTRAORDINARY OR COMPELLING, THE COURT SHOULD STILL DENY THE REQUEST BECAUSE IT WOULD UNDERMINE THE GOALS OF CRIMINAL SENTENCING

The statute also requires that the Court consider whether releasing the defendant is consistent with the factors set forth at 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(1)(A). That is, relief under § 3582 is a discretionary remedy that should balance the risks of COVID against the likelihood that releasing the defendant will undermine the goals of criminal justice. Order Denying Motion for Compassionate Release, *United States v. McCaflin*, 1:17-cr-00168-CMA, ECF No. 129 (July 20, 2020); *United States v. Batista*, No. 19-cr-2-JFK, 2020 WL 3249233 (S.D.N.Y. June 16, 2020). Here, the Court should deny the defendant's motion because BOP has mitigated the general risks, because the defendant has not demonstrated any uniquely compelling risks setting him apart from many other inmates, and because the sentencing factors under §3553(a) compel denial.

### A. The Defendant Has Not Demonstrated that Compelling and Extraordinary Circumstances Outweigh § 3553(a) Considerations

On the risk side, the defendant's motion is supported by (1) the defendant's declaration, Def. Mot. at 8-10, (2) a study from UCLA, Def. Motion at 10, and (3) assertions about the risks posed by his underlying medical conditions, Def. Mot. at 10. But the statements in the defendant's declaration are self-serving, unverified, and contradicted by the declaration in Exhibit 1.

The government was unable to determine whether the assertions made about the conclusions of the UCLA study in the brief are accurate. The brief asserts that COVID-19 cases are 5.5 times higher and deaths are 3 times higher in prison than in the general population. But the link in the brief, as far as the government can tell, links to a page that itself contains additional links to raw data with no analytical report. Def. Mot. at 10. To the extent that the conclusions are based on *both* state and federal prisons, the data points about "prisons" in general are inapplicable: the Federal Bureau of Prisons is a unique entity with its own operational protocols, a population that may be different from state populations and its own record to stand on. Lumping it in with all prison systems is potentially misleading. Similarly, the motion correctly notes the total number of cases in the *entire* Bureau of Prisons, but does not note that as of August 5, 2020 there were only 5 confirmed cases at Englewood FCI (all of those are at the FDC; none are where the defendant is housed) or that fact that 4 of those inmates have recovered. See https://www.bop.gov/coronavirus/index.jsp.

Finally, for the reasons set forth above, the defendant has not provided evidence sufficient to meet his burden of proving extraordinary and compelling circumstances that would tilt the risk side of the ledger towards release.

### B. Release Would Undermine the Goals of Criminal Sentencing Set forth at 18 U.S.C. § 3553(a)

The government incorporates by reference here its original sentencing papers, docketed at ECF Nos. 124 and 134. The question presented by the defendant's motion is whether the risks of COVID 19 — risks heavily mitigated by BOP in general and not specifically more compelling or extraordinary for this defendant than for many other inmates or people in the general population — are so drastic as to radically alter the Court's original judgment by approximately 64%.[4] They are not.

COVID19 has not changed the §3553(a) calculus. But the defendant's own acts have. The defendant asserts in his declaration that "I have accepted responsibility for my past." His actions at the sentencing hearing and after belie this assertion. At the sentencing hearing he sought a sentence of 6 months imprisonment. Before the Court pronounced the sentence, the defendant also said he accepted responsibility and gave his "sincerest" apology. Sentencing Hearing Transcript, ECF No. 162 at 19 (December 9, 2019) (Gov't Ex. 2). After the Court announced its sentence — despite a warning from the Court that speaking would be unwise — he revealed that his prior statement had simply been a pretense to get what he wanted. He expressed contempt for the jury's verdict and the entire system of justice, calling his sentencing a "mockery on the justice system." [Gov't Ex. 2 at 31]. Then he denied committing the mail fraud for which he was convicted; in fact, he denied committing any crime at all. [Gov't Ex. 2 at 33]. Rather, in

---

[4] The Court imposed a sentence of 51 months just this past December. As of July 27, 2020 he had served approximately 35.8% of his sentence. [Exhibit 1 at 13(¶41), 25].

his view, the jury's verdict and the judgment of the court "illustrates total disregard for the truth" and told the Court that he was being sentenced for something he didn't do. [Gov't Ex 2 at 34, 36]. After all of that, he filed an appeal that led his appellate counsel to file an *Anders* brief because there were no non-frivolous arguments. The Tenth Circuit affirmed his conviction in a short *per curiam* opinion agreeing with defense counsel. ECF No. 169. These are not the actions of someone who accepts responsibility. They are the actions of someone who seeks to avoid it.

Absent extraordinary and compelling risks, releasing the defendant would undermine the § 3553(a) factors. He obstructed a grand jury and then called a petit jury's verdict a "mockery." Releasing him would undermine respect for the law. He used his medical license to perpetrate an extensive years-long fraud involving fake diagnoses and fraudulent charts. Now he has advanced new diagnoses in his own case in support of an early release. Such a release would disparage the seriousness of his crime and fail to account for its nature and circumstances. In the midst of the opioid crisis, the defendant admitted to distributing opiates outside the usual course of professional medical practice. At his sentencing he denied it and then tried to justify it by saying that "[d]octors in America should not be afraid of treating patients with pain, and that's what I was doing." [Gov't Ex. 2 at 35]. Releasing him for these crimes with a sentencing discount of 65% would undermine, rather than promote deterrence.

The defendant's case is no more compelling than the defendant in the *McCaflin* case where the court, quoting *United States v. Israel*, stated:

> cutting [his] sentence **in half**—which is what he requests—would undermine the goals of sentencing set forth at . . . § 3553(a). In particular, reducing [his] sentence would not reflect the seriousness of his crimes, provide just punishment, or promote respect for the law."

14

> \* \* \*
> Adjusting Israel's sentence downward on "compassionate" grounds, despite the seriousness of his crime and the amount of his fraud . . . does nothing to promote respect for the law. It simply reinforces the belief that there is one law for the white-collar criminal and another law altogether for the ghetto dweller or the drug dealer. [2019 WL 6702522at *9, 10 (emphasis added)]

Order Denying Compassionate Release, *United States v. McCaflin*, 1:17-cr-00168-CMA, ECF No. 129 (July 20, 2020)

## V.     CONCLUSION

The risks associated with COVID-19, by themselves, do not warrant a sentencing reduction here and the defendant has not satisfied his burden of showing that his particular risks are extraordinary and compelling. Even if they were, releasing him in August after sentencing him in December for years of unrepentant fraud and drug dealing would undermine, rather than promote, the goals of federal sentencing. For all of the reasons set forth above, the defendant's motion should be denied.

                              Respectfully submitted,

                              JASON R. DUNN
                              United States Attorney

By:   s/ *Bryan David Fields*
       BRYAN DAVID FIELDS
       Assistant United States Attorney
       1801 California Street, Suite 1600
       Denver, Colorado 80202
       Telephone: (303) 454-0100
       Facsimile: (303) 454-0404
       Bryan.Fields3@usdoj.gov
       Attorney for the Government

**CERTIFICATE OF SERVICE**

        I hereby certify that on this 7th day of August, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

        s/ *Bryan David Fields*
        BRYAN DAVID FIELDS
        Assistant United States Attorney
        1801 California Street, Suite 1600
        Denver, Colorado 80202
        Telephone: (303) 454-0100
        Facsimile: (303) 454-0404
        Bryan.Fields3@usdoj.gov