1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3
     Criminal Action No. 18-CR-00293-RBJ-1
4

5    UNITED STATES OF AMERICA,

6          Plaintiff,

7          vs.

8    JOHN VAN WU,

9          Defendant.

10   ------------------------------------------------------------

11                   REPORTER'S TRANSCRIPT
                       Sentencing Hearing
12
     ------------------------------------------------------------
13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 15th day of October, 2019, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                          APPEARANCES

17   For the Plaintiff:
     BRYAN D. FIELDS, U.S. Attorney's Office, 1801 California St.,
18   Ste. 1600, Denver, CO 80202

19   For the Defendant:
     DRU R. NIELSEN, Eytan Nielsen, LLC, 3200 Cherry Creek Drive
20   South, Ste. 720, Denver, CO 80209

21

22

23

24
         Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                Denver, CO 80294, 303-335-2108

             Proceedings reported by mechanical stenography;
                  transcription produced via computer.

1              *         *         *         *         *

2       (The proceedings commenced at 10:22 a.m.)

3              THE COURT:  18CR293, United States versus John Van

4    Wu.

5              Appearances.

6              MR. FIELDS:  Good morning, Your Honor.  Bryan Fields

7    for the United States, and with me at counsel's table is DEA

8    Special Agent Michael Tonozzi.

9              THE COURT:  Thank you.

10             MS. NIELSEN:  Your Honor, I'm Dru Nielsen.  I

11   represent John Wu, who is present with me in custody sitting

12   at counsel table.

13             THE COURT:  Thank you.  All right.  We're set for

14   sentencing this morning.

15             Ms. Nielsen, you may proceed.

16             MS. NIELSEN:  Thank you.  Your Honor, to start, due

17   to the rescheduled sentencing date, the presentence

18   confinement time is now 188 days.

19             THE COURT:  Okay.

20             MS. NIELSEN:  John Wu's been in custody now, as the

21   Court knows, for over six months, and that amount of time for

22   a nonviolent first offender devoted to his family constitutes

23   serious and just punishment.  Prior to being incarcerated,

24   John Wu was on pretrial supervision for nine and a half

25   months.  He had perfect compliance with all the terms of

1    supervision.  I have here three certificates that Dr. Wu gave

2    to me yesterday of programs he's completed at Geo; anger

3    management, parenting, and a self-study course.

4         He has also served and has been leading an unofficial

5    Bible study at Geo, and also an origami class for other

6    inmates.  But I don't think anybody in this courtroom really

7    thinks that John Wu is going to re-offend or that prison is

8    going to provide him with needed educational training or

9    treatment.  What we're really talking about today is what is

10   just punishment.

11        In fashioning a sentence, the Court shall impose a

12   sentence sufficient but not greater than necessary.  The Court

13   shall consider the history and characteristics of the

14   defendant.  Now, the Government in its pleadings encourages

15   the Court to look only at a small window of time in John Wu's

16   history and only at the negative characteristics that he

17   exhibited in that small window of time.  But 3553 doesn't say

18   the Court shall consider the negative history and

19   characteristics.  It says the Court shall consider the history

20   and characteristics of the defendant.

21        John Wu is 50 years old.  The vast majority of his

22   history and characteristics are extremely positive, and

23   significantly more positive than other defendants that come

24   before this Court.  John Wu's unique history and his very

25   positive characteristics weigh in favor of a below-guideline

1   sentence.

2         I will not reiterate for the Court everything that

3   I've laid out in my papers, but I want to generally categorize

4   his extremely positive history and characteristics.  One, what

5   he overcame and accomplished as a child and a teenager; two,

6   the tremendous academic success resulting in full-ride

7   scholarships throughout his academic career, residency and

8   fellowship at one of the most prestigious medical institutions

9   in the country, if not the world.

10        To John Wu, those academic accomplishments are much

11  less important than the accomplishments he has had in serving

12  thousands of patients over his 16 years of service, and his

13  accomplishments as a father.  But the Government suggests you

14  should not factor in these characteristics because other

15  people who are not doctors don't have the same opportunity to

16  help people like doctors do, and that logic doesn't make

17  sense, and it's not what the statute says.

18        And as I thought about this, I thought of lawyers.

19  Lawyers have an opportunity to help other people, but not all

20  lawyers are the same in their history and characteristics.  We

21  know that some lawyers care more about helping others.  Some

22  help more than others.  Some care less about money and more

23  about serving their communities, and that was Dr. Wu the vast

24  majority of his career.  Serving patients, not making lots of

25  money, not living high on the horse (sic), but interested in

1   serving his community, serving patients, and being a father

2   and a husband.

3          If anything positive has come out of this situation,

4   it has been John Wu's reflection on his life priorities.  John

5   Wu did struggle with the balance between his career and his

6   family, like many of us do.  When he lost his medical practice

7   and before he was incarcerated, John Wu turned all of his

8   attention to his family.  Even since he's been incarcerated,

9   John Wu remains focused on his family.  I think the photos and

10  what he's done making them toys in the prison, it may seem

11  trivial, but it speaks volumes to what is in his heart.

12         And while he tells his children they don't need to

13  come so frequently, the whole family has visited John Wu three

14  times a week for the duration of his time at Geo.  I've seen

15  the children there numerous times with their schoolbooks

16  waiting politely in the lobby to see their father.  The

17  children are extraordinary.  They're great kids, and I think

18  some of that is a testament to John Wu.  They desperately want

19  and need their father back in their lives full-time as soon as

20  possible.

21         I also talked in my papers about the life

22  circumstances that were occurring at the time of these

23  offenses.  Again, the Government suggests that the Court

24  should not consider this, but the statute specifically says

25  the Court shall consider the circumstances of the offense.

                        Sarah K. Mitchell, RPR, CRR

18-CR-00293-RBJ-1          Sentencing          10/15/2019    6

1   John Wu lost a child.  His marriage started to fall apart.

2   And I think we've all seen in times of great grief and loss

3   and stress that sometimes people make bad decisions.  John Wu

4   made bad decisions.  John Wu stands before you today a humbled

5   man, but he remains focused, Your Honor, on being a good

6   strong person, and once again being able to provide for his

7   family and being a contributing and positive member of our

8   community.

9        Your Honor, two members of John Wu's family would

10  like to address the Court.  His wife Ms. Nguyen was not able

11  to be here today, so his daughter, 16-year-old daughter

12  Josline, would like to read a letter from Ms. Nguyen, and also

13  make a brief statement to the Court.

14        THE COURT:  Okay.

15        MS. NIELSEN:  Thank you.

16        THE COURT:  Good morning.

17        MS. JOSLINE WU:  Good morning.  Hello, Your Honor.

18  My name is Josline Wu, and I'm John Wu's oldest daughter, and

19  I will be reading my mom's letter to you.  I really -- Dear

20  Judge Jackson, I really appreciate you giving me the

21  opportunity to have Josline speak on my behalf.  I was sorry I

22  am unable to be there today as I have suffered from some

23  health issues for the past few months, and I am currently

24  taking care of our little children at home.  These past four

25  years, and especially these past six months after the trial,

1    have been very difficult and devastating to my family.  It is

2    extremely hard when your youngest son asks, Mommy, why can't

3    daddy be home with us, and all I can say is that we just have

4    to pray for daddy to come home.

5          John was not only an amazing doctor who always made

6    sure his patients received the best possible care, but he is a

7    wonderful father who loves his children more than anything.

8    John and I have always made sure to make our children our

9    priority, and for that we have focused on making our marriage

10   better for the kids.  John would always do everything with the

11   kids, like go on bike rides as a family and go to his

12   community church and have all of them do homework together in

13   the family room so that he can answer their questions.

14         When I was seven years old, I lost my father during

15   the Vietnam War.  I do not remember holding my father's hand,

16   him giving me kisses, or his arms wrapped around me giving me

17   the biggest hugs.  I never want my children to be missing

18   their father like I did.  That is why I feel truly sad for my

19   little one because he is only five, and I do not want him to

20   lose that closeness he had with John.  John would tuck him

21   into his bed every single night and read a bedtime story to

22   him no matter how exhausted he was.  Sometimes I would catch

23   them both asleep in our son's bed with the book lying on top

24   of them.

25         All I want is for my husband to come home so that he

                    Sarah K. Mitchell, RPR, CRR

1   can be there for our children like he used to.  They need

2   their father at this crucial time in their lives, and I will

3   need John's help with caring for our children and rebuilding

4   our family.

5          John truly loves to help others, and he always puts

6   other people before himself.  When I was first dating John and

7   he was doing his residency at Johns Hopkins, there were many

8   days and many nights he did not come home because he was at

9   the hospital.  He loved what he was doing more than anything,

10   and I loved him for how hard he worked and how he was

11   dedicated to helping his patients.  He has always wanted to

12   contribute and make a visible difference, as you have read

13   from the many appreciation letters he has received from his

14   patients for the last 16 years.

15          There were also holidays such as Christmas when John

16   spent -- when John slept at the hospital because he was on

17   call, and there were no other doctors willing to work on the

18   holidays, but John would do it in a heartbeat.  And if John

19   was not on call, then on Thanksgiving he would be at the

20   homeless shelter cooking and serving food to the homeless.

21   For several years he ran a toy drive during Christmas for

22   children who do not usually receive presents.  I hope this

23   shows you that John is a giving man, and he has helped his

24   community when he gets nothing out of it besides the fact that

25   he was able to impact people's lives.

                        Sarah K. Mitchell, RPR, CRR

1          I hope, Your Honor, that you have leniency when

2    sentencing my husband.  He's a good man, but above all else,

3    he's an amazing father.  I know that John is truly sorry.  The

4    children and I need John back in our home.  Thank you very

5    much.  Sincerely, Audrey Wu.

6          And I've made a brief statement that I would also

7    like to say to you.  Your Honor, all I want is for my dad to

8    come home.  With him not being home I have felt lost.  There

9    have been many mornings before school when I have had panic

10   attacks and could do nothing else but cry.  I need him at this

11   crucial time in my life as I prepare for the SAT and begin

12   applying for colleges.  My siblings also need him more than

13   anything, especially my youngest brother.  I never want him to

14   lose the special bond he had with our dad.  Please, please,

15   please let my dad come home to us so he may be there for us

16   when we need him the most.

17          Daddy, we love you so much.  Not only were you there

18   to help me through my education, but you were my emotional

19   rock supporting and believing in me when I did not believe in

20   myself.  You have always been and will always be my role

21   model.  Thank you for shaping me and my sister into the strong

22   young women we are.  Without you I do not know what I would

23   do.  And my little brother this morning, he wanted me to tell

24   you that he misses you and loves you a lot, and he wants you

25   to come home with us so that you can play -- you and him can

1   play with the toys that you made him while you were in there.

2   And mommy also loves you, and she needs you to come home.

3          Thank you, Your Honor.

4          THE COURT:  Thank you.  That's very nice.

5          MS. NIELSEN:  Your Honor, will the Court also hear

6   briefly from Jessica Wu?

7          THE COURT:  Sure.

8          MS. JESSICA WU:  Your Honor, I'm Jessica Wu.

9          THE COURT:  Good morning.

10          MS. JESSICA WU:  Daddy, I just want to say that I

11   love you a lot.  All I need is for you to come home, and I

12   wish I could come over there and just hug you and give you a

13   kiss because I miss you so much.  Thank you, Your Honor.

14          MS. NIELSEN:  Would the Court like to hear from John

15   Wu now or after the Government's presentation?

16          THE COURT:  How about his parents, would they like to

17   say anything this morning?

18          MS. NIELSEN:  No.  I appreciate the Court recognizing

19   their presence.  They're here to support their son.

20          THE COURT:  They've been here every day.

21          Yes, Mr. Wu, would you like to address the Court this

22   morning?

23          THE DEFENDANT:  Thank you.  Can I speak afterwards?

24          THE COURT:  I couldn't quite hear what you said.

25          MS. NIELSEN:  I think he needs a moment to compose

1    himself, Your Honor.

2              THE COURT:  That's fine.

3              All right then, Mr. Fields.

4              MR. FIELDS:  Thank you, Your Honor.  I'd like to

5    incorporate the Government's sentencing filings.  I won't

6    repeat them here.  Those are at ECF Nos. 124 and 134.

7              THE COURT:  What's the conclusion you've drawn on the

8    safety valve?

9              MR. FIELDS:  Your Honor, in consultation with defense

10   counsel, my understanding is that he will not qualify for

11   safety valve because he has not provided truthful and complete

12   evidence about what he's done to the Government.

13             THE COURT:  All right.  So then your position is that

14   the offense level is 23?

15             MR. FIELDS:  Yes, Your Honor.

16             THE COURT:  And the defense I think agrees with that.

17             MS. NIELSEN:  We do, Your Honor.

18             THE COURT:  Probation does not.  Criminal history

19   category I, and so your belief is that the range is 37 to 46?

20             MR. FIELDS:  46 to 57, Your Honor, at level 23.

21             THE COURT:  That's right.  46 to 57.  Okay.

22             MR. FIELDS:  So, Your Honor, I'll respond to what

23   defense counsel said.  First, I would say a sentence of six

24   months would be a gross miscarriage of justice.  The

25   Government is asking for 57 months, which is what probation

1    also recommends in this case given its neutral evaluation of

2    the evidence.  With regard to the fact that he was compliant

3    with his pretrial supervision, respectfully, Your Honor, I

4    don't think that should have any impact on the sentencing.  He

5    should not get an extra benefit simply for following the law

6    after being charged in this case.

7           I would also reject the premise that this case is all

8    about what is just punishment.  It is also about the other

9    factors in 3553(a), which include the guidelines, the nature

10   of the offense, respect for the law, and deterrence.  And even

11   when we get to history and characteristics, which I'll focus

12   on now --

13          THE COURT:  And also community safety.

14          MR. FIELDS:  And community safety.  Even when we get

15   to history and characteristics, which I'll get to now, what I

16   would say is that the law requires you to consider his history

17   and characteristics, but you are not required to credit it or

18   to give him a lower sentence for all of these factors that are

19   set forth.

20          THE COURT:  Okay.  I'm not sure I need to be lectured

21   by either side on what my authority is and what my

22   responsibilities are.

23          MR. FIELDS:  I apologize for that, Your Honor.  So

24   I'll just get right to it then.  I don't think any of the

25   history and characteristics advanced by the defendant warrant

                        Sarah K. Mitchell, RPR, CRR

1   a lesser sentence here.  To go to the lawyer analogy, the idea

2   that because a lawyer went to Harvard, had a prestigious

3   clerkship, that later on when he commits a crime he should get

4   a lesser offense is nowhere present in the law, and, in fact,

5   the case law is to the contrary for all the reasons set forth

6   in the Government's brief.  That's the *Morgan* case out of the

7   Tenth Circuit and the *Sample* case out of the Tenth Circuit,

8   citing numerous out-of-circuit authority that white-collar

9   professionals in general shouldn't get a lower sentence simply

10  because of all of the advantages that they've been given.

11          The idea that because Dr. Wu was able to serve his

12  patients he should get a lesser sentence -- again, to use the

13  lawyer analogy, the fact that a lawyer serves clients

14  throughout his career, and then commits a crime for several

15  years involving those clients, the analogy would be falsifying

16  their records or falsifying legal documents associated with

17  them, that doesn't warrant a lesser sentence.  If anything --

18          THE COURT:  Mr. Fields, the fact that a defendant has

19  done a lifetime worth of good does count and is a mitigating

20  factor and is something that this Court considers, so please

21  don't try to convince me that his remarkable life story, as

22  Ms. Nielsen calls it, and all the good that he's done for

23  patients and other people are meaningless, because they're not

24  meaningless to me.

25          MR. FIELDS:  Your Honor, I don't want to -- I

1    apologize.  Perhaps I'm overstating my argument.  I'm not

2    saying they are meaningless.  I'm saying that in this

3    circumstance, they do not warrant -- they certainly do not

4    warrant the substantial variance that the defendant is asking

5    for.

6              THE COURT:  I agree with that.

7              MR. FIELDS:  Taking all of that into account, which

8    the Government did, is one reason the plea agreement does not

9    allow us to ask for an upward variance.  I'm not asking for an

10   upward variance.  The guidelines in this case, 46 to

11   57 months, take all of that into account, and also all of the

12   bad things that he did in this case.

13             The Court sat through the trial, so I don't think I

14   need to belabor that too much.  But what we have here is a

15   situation where this defendant -- and it wasn't a small window

16   of time.  It was a period of years where he made the conscious

17   choice over and over and over again to lie to his insurers, to

18   lie to his patients, to lie to law enforcement, and then when

19   he finally gets caught, he lies to a jury as well.

20             THE COURT:  I didn't know he lied to his patients.

21             MR. FIELDS:  He did, Your Honor, to the extent that

22   he was falsifying his patients' files, and you heard testimony

23   at trial that his patients thought they needed to come in to

24   get treatment that they didn't necessarily need to get, those

25   are false statements to his patients, and his patients were

                         Sarah K. Mitchell, RPR, CRR

1    disserved by his treatment of them.

2              THE COURT:  I agree with that.

3              MR. FIELDS:  These reasons, Your Honor, I think

4    militate in favor of a top-of-the-guidelines sentence.  So why

5    -- let's -- keeping as sort of a baseline here that the

6    Government thinks the sentencing range is appropriate, why top

7    of the guidelines versus bottom of the guidelines.  So, first,

8    what I would say here is that the guidelines themselves

9    actually ask for a sentence towards the upper end of the

10   guideline range.  That's 3D1.4(c).

11             So while the Government agrees that in this case the

12   grouping rules don't necessarily result in an enhancement of

13   the sentence, the guidelines themselves indicate that that may

14   happen, and that when you have a defendant who's engaged in

15   broad -- you know, a broad scope of criminality, that that may

16   warrant a sentence towards the upper end of the range.  And I

17   would say that's the case here, Your Honor.

18             This is a defendant who's committed not just one type

19   of crime, but who's engaged in crime in various different

20   aspects of his professional career.  So it wasn't just the

21   lying to the insurers.  He was also lying to pharmacists, to

22   other medical professionals.  And he was also writing false

23   prescriptions.  He was distributing oxycodone, an incredibly

24   addictive and dangerous substance, for no legitimate purpose.

25   That causes incredible social harm.

 1          First, you have the corrosive aspect of just fraud

 2   within the medical profession.  It's difficult for the medical

 3   profession to operate if medical professionals can't trust one

 4   another.  And then on top of that, you have this incredibly

 5   dangerous substance that's being diverted to the outside world

 6   where it can be abused.  And as I'm sure the Court is aware

 7   from the news, from new CDC guidance, from an increasing

 8   regulatory view towards these crimes, oxycodone and opiates

 9   are causing immense harm throughout our society and to

10   individual patients.

11          The manifold circumstances of this criminal conduct

12   warrant a sentence towards the upper end of the range, which

13   is 57 months.  And so for all of those reasons, the Government

14   would respectfully request, not that you not consider all the

15   good he's done in his life, but that taking all of that into

16   account and balancing it against all of the other 3553(a)

17   factors, a sentence of 57 months is sufficient but not greater

18   than necessary to accomplish all of those objectives.  Thank

19   you, Your Honor.

20          THE COURT:  Thank you.

21          Mr. Kruck.

22          PROBATION OFFICER:  Yes, Your Honor.  I'll just start

23   off by saying 90 percent of the investigations I do in this

24   district, the attorneys will say, you know, don't ask him any

25   questions about the offense, which is understandable.  When I

1    am allowed to ask that question -- you know, I've got

2    discovery.  I don't know what happened in the case, but I'd

3    like to ask what was going on in your life?  What was the

4    circumstances around why you committed this offense?  In this

5    case, I was not allowed to ask Dr. Wu these questions, and

6    it's one that I really wanted to know, because through my

7    investigation, I didn't find anything that would indicate for

8    his background, for what type of man this is a reason for him

9    to do what he did and commit the offenses that he committed.

10           I looked into the financial -- a lot of times in a

11   situation like this there might be a financial issue with the

12   family where he was trying to make money and things like that.

13   I went to the residence.  He's not living above his means at

14   all.  I checked his credit report and did a financial

15   background, and it does not seem like he was in any financial

16   trouble.  It's a head scratcher to me why this individual with

17   such an amazing life with all the good things he's done in

18   this world that he committed these crimes.  So maybe Dr. Wu

19   can educate the Court and myself on that later, if he wishes

20   to.

21           The probation office is recommending 57 months

22   incarceration followed by three years of supervised release.

23   The Government had touched on numerous factors already.  I'll

24   just, once again, kind of summarize what I had in my

25   justification.  I think it is a huge concern that he used his

1    position to get these drugs onto the street.  As we saw in the

2    case right before this one, an individual's parents were

3    infected by -- or he was affected by his parents being drug

4    addicts growing up, and in turn, he wasn't -- he didn't have a

5    lot of the privileges that other people had when he was

6    growing up, so it caused him a difficult lifestyle.  For

7    Mr. Wu to be putting these drugs out into the community, not

8    only is he affecting the user, but as we saw earlier in that

9    earlier hearing, he's affecting the children of those people

10   that are using also, and it just has a corrosive effect on

11   society as a whole.

12          Another point, he did this over a certain amount of

13   time.  It wasn't a one-time offense where he regretted it as

14   soon as he did it.  This happened for a substantial period of

15   time.  Once he was caught, then he was -- he was falsifying

16   documents, he was lying, he was doing things to cover up his

17   behavior, so that is also another concern.

18          Once again, we feel you have to look at the positives

19   he's done in the community.  That's why we had recommended --

20   I think a 51-month sentence was appropriate for a first-time

21   drug dealer.  We added some months onto that due to the fact

22   that there was some sort of coverup, but we do give him credit

23   for the amazing life he's led and the good things he's done in

24   the community, Your Honor.  That's all.  Thanks.

25          THE COURT:  Okay.

1            MS. NIELSEN:  Judge, can I say one thing?  And it

2    will be brief, I promise.  I'm sure the Court is aware, but I

3    just wanted to point out that probation's recommendation was

4    midpoint of the guideline range because they had calculated

5    the guideline offense level to be 24.  Thank you.

6            THE COURT:  All right then, Mr. Wu, would you like to

7    now address the Court?

8            THE DEFENDANT:  Yes.  Good morning, Your Honor.  Your

9    Honor, never in a million year would I have picture myself

10   sitting here -- standing in front of you.

11           THE COURT:  Would it be possible for you to go to the

12   lectern, sir?  I can hear you a little better, I think.

13           THE DEFENDANT:  Good morning, Your Honor.  Your

14   Honor, never in a million year would I ever picture myself

15   standing in front of you.  I'd like to take this opportunity

16   to accept responsibility for my actions that have landed me

17   before you today.  Never in my life would I have envisioned

18   separating myself from my family or removing myself from the

19   lives of patient in dire need of my medical attention.  I

20   stand here today as a man in pain.  This process is very

21   unique and humbling in every aspect, but the suffering that I

22   have put my family through is definitely tormenting, and I

23   would do anything to fix that.

24           Your Honor, I have devoted my entire life to humanity

25   and to my family.  I always focused on dedicating my time and

```
 1   myself to try to improve our world.  I choose medicine for one

 2   reason, and that was to be able to help other.  As with my

 3   family, being a father is my true blessing to my life.  I

 4   wouldn't trade it for the world.  It is my everything, and

 5   above all, I want to be there for them to support them through

 6   whatever they come across in life.  I offer to people in this

 7   courtroom, my family, Your Honor, my sincerest apology.  I'm

 8   devastated and truly sorry.

 9          THE COURT:  I'm not sure if you're finished.

10          THE DEFENDANT:  Can I discuss with my legal counsel

11   for a second?

12          THE COURT:  Yes.

13          THE DEFENDANT:  I'm finished, sir.

14          THE COURT:  All right.  Thank you.

15          The Court has considered all of the written

16   statements that were submitted, the letters, the arguments,

17   the motions, the speeches here today.  And speaking of the

18   letters, I want to acknowledge letters I have received and

19   reviewed from Josline, Dr. Wu's oldest daughter; Jessica,

20   who's the second oldest; of course, from his wife that was

21   read to us today from her letter; from Dr. Karen Wu, his

22   sister; from William Wu, Mr. Wu's father, who has been here

23   every day and every hearing, together with his mother; Shannon

24   Pinkngy -- I probably mispronounced Shannon's name; the

25   Davidson family; difficult to read the signatures, but
```

Sarah K. Mitchell, RPR, CRR

1    somebody and Laura; George and Sumi Hiroki; Sharon Balcom,

2    daughter of Peggy Gillibrand; Angie Mills; Gerard Mayberry,

3    and if I missed any, I apologize.  These were family members

4    and patients who wrote nice letters on behalf of Dr. Wu.

5           So the Court has taken all of their thoughts into

6    consideration, as well as the reasons that we are here, which

7    is that Dr. Wu has been convicted of multiple felony crimes.

8    Starting with Count 19 of the superseding indictment, knowing

9    or intentional distribution of a controlled substance, either

10   not for a legitimate purpose or outside the usual course of

11   professional medical practice.  Counts 36 through 39, mail

12   fraud.  Counts 40 through 51, falsification of records.

13          On each of those counts the statute authorizes the

14   Court to sentence the defendant up to 20 years in prison, to

15   fine him up to $2 million, and to sentence him up to life on

16   supervised release.  And with all those counts, you can't even

17   hardly imagine the total that potentially he faces.  Something

18   like 16 or 17 counts times 20 years -- you can do the math.

19          The facts -- the facts in summary are, as to Count

20   Number 19, on that count Mr. Wu pled guilty.  He pled guilty

21   to dispensing oxycodone for illegitimate purposes.  Count 19

22   itself involved prescriptions for 60 oxycodone 30-milligram

23   tablets to a patient described by the initials L.V.N. on

24   May 31st, 2014, according to Dr. Wu, in response to L.V.N.'s

25   complaint of substantial serious back pain subsequent to a

1   fall.  However, L.V.N. denied falling down stairs, denied

2   having back pain, and denied ever visiting Dr. Wu for medical

3   treatment.  In short, it was all false.

4            Count 19 is one of five counts purportedly involving

5   prescriptions for L.V.N., who, again, has indicated she has

6   not consulted Dr. Wu for medical treatment.  It's one of 27

7   counts of allegedly similar conduct involving seven different

8   patients.  Now, that's one case.  This case really involves

9   two cases within the one umbrella.  That one case, of which

10  Count 19 is an example, and that is the one to which he pled

11  guilty, is for prescribing oxycodone, an opioid, to people who

12  didn't need it, didn't qualify medically for it, basically to

13  put it out there on the street for it to be misused and

14  abused.

15           The other counts are the counts that went to trial,

16  Counts 36 through 51.  Those counts involved a scheme to

17  defraud employee benefit plans, essentially, by making false

18  claims for payment for services that were not rendered,

19  possibly to try to cover up what he had done with respect to

20  oxycodone, although I can't say that for sure.  All I can say

21  for sure is that he was convicted of making these false --

22  sending these false statements to the insurance companies

23  claiming service after service after service over a period of

24  long months and years that he didn't do.

25           What's missing from my summary of the facts, because

Sarah K. Mitchell, RPR, CRR

1   I don't know the answer, is why, why would this man do these

2   things?  Why does somebody with his background of success,

3   extraordinary success, do such things?  I don't know.  He

4   really hasn't ever told us.  And that's his right.  He doesn't

5   have to.  Especially on the counts to -- the count to which he

6   pled -- or to which he went to trial, he doesn't have to

7   confess or explain.  But you always wonder why would somebody

8   do something so incredibly foolish and so personally

9   destructive and so harmful to his family.  Maybe I'll never

10  know the answer.

11          The Court is required to consider objections to the

12  probation report.  There was an objection from the defendant.

13  It's complicated, but the essence of it is that the defendant

14  believes that the guidelines have included what amounts to

15  double counting.  He's been penalized twice for the same

16  conduct, so to speak.  The probation office in response has

17  explained what it did and why it stands by its calculation

18  indicating that the adjustment that the probation office made

19  for obstruction -- the adjustment for obstruction of justice,

20  paragraph 72 of the report, which has to do with the oxycodone

21  group, is a separate and distinct act from falsification of

22  records pursuant to paragraph 77, which relates to the mail

23  fraud -- it relates to the mail fraud group.

24          On the other hand, the Government, having reviewed

25  the objection, agrees with the defendant, and basically

1  indicates that there's some built-in double counting.  I think

2  it's not clear under the guidelines.  I think a good argument

3  can be made, and has been made by the probation office, that

4  technically they have calculated things precisely correctly,

5  but I also think that there's a good argument that there is an

6  unfairness built in, and that, as even the Government

7  recognizes, a good argument exists precisely for the reasons

8  provided by the defense.

9          In that situation, the rule of lenity applies in my

10  view, and I resolve the doubts in favor of the defendant and

11  sustain the objection.  And for that reason, in considering

12  the first factor that must be considered for purposes of

13  sentencing, the Court finds that the offense level is 23, not

14  24, the criminal history category is I, and the guideline

15  recommendation to the Court is to sentence between 46 and

16  57 months, whereas without the objection, it would have been

17  51 to 63 months.

18          Guidelines are only one factor that the Court

19  considers.  The next factor is the nature and circumstances of

20  the offense.  I've talked about it already.  Two different

21  kinds of fraud committed multiple times and sustained over a

22  period of time.  The first kind of fraud involving this highly

23  publicized oxycodone opioid, which is now the subject of

24  multiple civil cases and criminal cases around the country.

25  And the second kind is the cheating or attempting to cheat the

1    Government -- or the insurance companies, I should have said,

2    out of a not insignificant amount of money.

3           The total amount of restitution agreed by the parties

4    is $94,829.38, and that's spread out over all these counts.

5    So each individual false bill wasn't necessarily so much, but

6    when you put them all together, it adds up to quite a bit of

7    money.  But it's not even the money that troubles the Court as

8    much as just the difficulty I have in even trying to come to

9    grips with why this guy would do that.  Clearly it was a

10   significant crime and deserves a significant punishment.

11          History and characteristics of the defendant, there's

12   no question in my mind but that the positives in Dr. Wu's life

13   are mitigating factors.  And it's kind of incredible really.

14   This guy came out of a country in war, somehow survived with

15   other boat people, and got himself admitted to an outstanding

16   university on scholarship, then to the Johns Hopkins medical

17   school where he was an excellent student, and became basically

18   a family-type practitioner in the Vietnamese community where

19   he served many, many, many patients.  Served them well, I'm

20   sure.  Probably quite forgiving as to costs for those who

21   couldn't afford it.

22          Meanwhile, he volunteered in the community.  He

23   obviously has raised fine children who adore him.  He's the

24   kind of guy that should be on the cover of a magazine as an

25   example to others for what one can accomplish despite starting

1    out in difficult circumstances.  And yet here he is as an

2    example to others as to what you must not do to abuse the

3    privilege you've been given.

4          There is a need for punishment.  There is a need for

5    deterrence, not so much to deter Dr. Wu.  He's not even a

6    doctor anymore.  I call him Dr. Wu because he asked me to do

7    that earlier in this case, but he's not a doctor.  He's lost

8    the right to practice medicine.  He won't get that right back

9    again, I assume.  And even if he did, I can't even conceive

10   that he would do something like this again, although it's hard

11   for me to conceive that he did it in the first place.  But to

12   deter others, other doctors who may be tempted.

13         I had a case last year involving chiropractors who

14   made lots of money, but were tempted, filed false tax returns,

15   tried to cheat the Government out of the taxes they owed.

16   Why?  It makes no sense.  But to deter the doctors and the

17   dentists and the chiropractors and the other professionals who

18   provide health-related care from prescribing these opioids

19   when they are not appropriate, and from obviously cheating on

20   their bills, deterrence is a factor.  Community safety is a

21   factor in this Court's view when you're dealing with opioids.

22   So I must take all of that into account.

23         I absolutely agree with the Government lawyer when he

24   said that Courts should not go easy on white-collar criminals

25   just because they're in some way different than or better than

1  street criminals.  I agree with that.  I've always agreed with

2  that.  I've been very hard on white-collar criminals in my

3  career.  By the same token, I recognize the decency that this

4  man has lived for most of his life.  I recognize the

5  incredible humiliation that he must have gone through, and

6  still in front of his family, in front of his patients, in

7  front of his friends, his medical school, all these people

8  he's let down, and I think the judge has to have room for

9  compassion to be any kind of a judge.

10         No, there's no way that I give this defendant six

11  months' time served.  That's not in the ball game.  By the

12  same token, I see no value in going to the very top of the

13  guidelines to punish him.  He's being punished plenty.  I did

14  recognize, as Ms. Nielsen pointed out, that the probation

15  office recommended a mid-guideline sentence.  That strikes me

16  as reasonable and appropriate and fair, and therefore the

17  Court will sentence the defendant to 51 months in prison,

18  three years of supervised release, accepts the recommended

19  terms and conditions of supervised release as provided by

20  Mr. Kruck, which I agree with.

21         Restitution of $94,829.38 as detailed on page SA-1 of

22  the second addendum to the probation report.  He must pay a

23  $100 special assessment fee per count.  That sentence is to be

24  served concurrently on all counts together.  He should get

25  credit for the 180-some days that he has served.  He, of

1   course, has a right to appeal within 14 days of the entry of

2   the Court's judgment.  Is there anything else?

3            MR. FIELDS:  Your Honor, I know the Court entered in

4   the preliminary order of forfeiture, but I would ask that

5   today you also orally enter that order as part of the record.

6            THE COURT:  Granted.  So ordered.

7            MS. NIELSEN:  Your Honor, we would ask for a

8   designation within state or a recommendation by the Court.

9            THE COURT:  I'll recommend that he be incarcerated

10  within one of the two facilities in -- actually, more than two

11  -- but one of the facilities in Colorado, although I've been

12  informed that the Bureau of Prisons is not necessarily all

13  that moved by judge's recommendations.  They have a number of

14  factors they consider.  But, yes, I hope he'll end up in one

15  of the Colorado places so he'll be able to be visited by his

16  kids who do want to visit him, notwithstanding his

17  discouraging them to do as much of that, and his parents and

18  his friends.

19           MS. NIELSEN:  And, Your Honor, one more thing.  The

20  PSI recommended that Dr. Wu does not have the ability to pay

21  interest, and we would ask the Court to waive the interest

22  requirement.

23           THE COURT:  Granted.

24           MS. NIELSEN:  Thank you.

25           THE COURT:  Mr. Kruck, anything else?

                    Sarah K. Mitchell, RPR, CRR

1            PROBATION OFFICER:  Nothing further, Your Honor.

2    Thank you.

3            THE COURT:  All right.  That concludes the hearing.

4    Thank you for your participation.

5            THE DEFENDANT:  Your Honor, is it okay if -- I would

6    like to make the statement that I would intend to say after

7    your statement.  You want to know why.  I want to give a

8    chance to tell.  This is -- when you asked this question why a

9    person like me doing this, I want an opportunity to let the

10   Court -- let you know and the prosecutor --

11           THE COURT:  Well --

12           THE DEFENDANT:  -- know why this has happened to

13   someone like me.

14           THE COURT: -- you might want to consult with your

15   lawyer who might be contemplating an appeal before you say too

16   much.

17           THE DEFENDANT:  I stayed up all night thinking over

18   this case, and come up -- I want to give you the answer to why

19   this happened, why -- want to know why it is not the case it

20   is.  If you might --

21           THE COURT:  At this point, the Court has completed

22   its sentence.  You might be better advised to follow your

23   lawyer's advice.

24           THE DEFENDANT:  But I want you to know the truth

25   about -- behind this, and -- if you don't mind.  Because you

 1   asked the question why would a person like me do something

 2   like this, and I wracked my brain out trying to figure out why

 3   too, and I want to say what I've been writing that I intend to

 4   tell you prior to the sentencing, if you allow me to.

 5          THE COURT:  You don't want to follow your lawyer's

 6   advice?

 7          THE DEFENDANT:  I will go against my lawyer's and my

 8   legal advisor's advice.

 9          THE COURT:  I don't think it's a good idea.

10          THE DEFENDANT:  Well, in my heart -- for the first

11   time -- like, you asked -- when you asked me -- I still

12   remember when you asked me last time when I -- why I accept

13   the plea, and then why something like this done, and I just

14   wracked my brain because, you know, I want a chance to let

15   everyone know -- I want the chance for my children, my parent

16   to know the truth, the fact, who I am, not what I'm being

17   sentenced today.

18          THE COURT:  Well, I'll tell you what.  Mr. Wu,

19   Dr. Wu, it might negatively impact your appeal, but --

20          THE DEFENDANT:  At this point --

21          THE COURT:  -- if that is what you want to do, you

22   talk to your family and me and tell us why.  It's against my

23   advice and your lawyer's advice.

24          THE DEFENDANT:  Yes, sir.  I understand that, and --

25   but I want my children to know the truth and my parents to

 1   know the truth, and that is more important for me on my

 2   principle and my dignity than anything.  I already willing to

 3   accept everything with the sentencing, but I want the truth to

 4   be known.

 5            THE COURT:  Okay.  Then say what you have to say.

 6            THE DEFENDANT:  Your Honor, even though by speaking

 7   up now today it might cost even some retaliation from the

 8   Government, but I have been silent and intimidated by the

 9   Government for too long.  I stayed up all night last night,

10   couldn't even sleep, preparing for the sentencing today.

11   Okay.  Today I'm no longer afraid or will keep silent by this

12   unfair, unjust and prejudice and mockery on our justice

13   system.  That's how I see it.

14            As you said, Your Honor, when you asked me last time

15   why I accept the plea, why I decide to accept the plea on our

16   last court date a few months ago, at that time all I was

17   thinking is from hearing what I know that there's no way I can

18   win.  No matter what I present in my case in evidence, I would

19   never win because that's the facts.  And I will just take the

20   fate of having to trust in all fairness of our country

21   judicial system, but after today I can no longer believe or

22   have faith in it.

23            The fairness of our system, this process has awaken

24   me, and you asked me why a person like me who have no criminal

25   history and no nothing commit all this crime.  I wanted to let

 1   you know, okay.  My parent and my siblings and I came to this

 2   country.  We serve and we protect this country.  We

 3   law-abiding citizen, and we truly believe in this great nation

 4   and the democracy and the constitution that all people are

 5   treated equally and justice should be fair for all, but today

 6   I see that the U.S. DA Mr. Brian Field, DEA Agent Michael

 7   Tonozzi make a mockery on our judicial system and in our

 8   courtroom.  Okay.

 9         On July 16th, 2015, my life totally turned upside

10   down.  My medical practice came under investigation scrutiny

11   after the arrest of these two individual witness who were

12   arrested for forgery of my prescription of controlled

13   substance, fraud, conspiracy of distribution of controlled

14   substance, unlawful possession of controlled substance, and

15   other criminal charges -- a list of charges as you look in the

16   investigation report.  Okay.

17         And also facing deportation.  They charged with all

18   this and they and their family make a deal with the Government

19   and lying cooperating witness and falsifying their accusation

20   on their testimony of the lack of doctor-patient relationship

21   and the failure of -- and the false accusation of the illicit

22   distribution of controlled substance by me.  Okay.  That's

23   according to the witness testimony, if you can come back and

24   look at on investigation 00000095, okay, which is perjury to

25   grand jury testimony, in my belief.

                        Sarah K. Mitchell, RPR, CRR

1          But when reading that, knowing that, that even when I

2    was being court -- on trial for mail fraud, first of all, I

3    tell you I have no intention or no knowledge of even doing

4    mail fraud.  And even though the law -- I never even -- as a

5    physician I never do any of those billing, and I was

6    protecting a friend and a family member not because I would

7    never intend or do anything fraud or anything.  Why I do fraud

8    for something of a check less than 6,000-something dollar

9    based on the transcripts in DEA, 6,052 dollar, okay.

10          In my opinion, that's why when you ask all these

11   question, and I've been thinking this for the last six and a

12   half month, all I want is to be home to my children.  I take

13   responsibility.  I take everything just because the love of my

14   family and to do what is -- whatever I thought -- by paying up

15   the restitution or whatever and accept my responsibility I

16   would be done.  I never commit any crime.  I never intend to

17   commit any crime.  I never intend to fraud any crime, because

18   I'm not that type of person.

19          And I'm a man of principle, and I have to absorb and

20   take that humiliation sitting there even while in the Geo

21   detention.  I tried to participate in helping other people,

22   even taking class where I tried -- I was at first doubt myself

23   why am I done this, and with all the self-study and

24   everything, I did not -- I can tell you to convince you that

25   I'm not a criminal or have any criminal aspects.  Okay.  This

Sarah K. Mitchell, RPR, CRR

1   is who I am.  I don't know if you believe me or not.  I wish

2   you know me on the outside instead in this situation.  Okay.

3         But the way I see it, this illustrates that -- this

4   case well illustrates the total disregard for the truth.

5   Okay.  On investigations 0000256, if you look at it, after the

6   -- the Government witness lied, falsified all the evidence

7   that you read through carefully that show that the DEA agent,

8   okay, even accept -- admit that he accidentally delete his

9   text message, and even while interviewing his witness -- he's

10  a professional, 22-year -- a professional, why did he not

11  record or do all that stuff?  And deleting or try to obstruct

12  the justice.  And then he said that because it's just an

13  accident.  Okay.

14        And this similar tactic was not only done using my

15  case.  While I was in there, I tried to search up some case

16  law.  I've seen this done to many other case involve other

17  doctors like myself, like Dr. Andrew Holt, Dr. Kevin Kremen,

18  and Dr. Alice Kelly.  This is a violation of U.S. Code 1623,

19  for declaration before the grand jury or court.  DEA Agent

20  Mr. Michael Tonozzi make a mockery of our justice system

21  because he know that he was forcing or causing the witness to

22  falsify or making false accusation.  Okay.

23        In my opinion, Your Honor, why are the charges

24  dismissed cooperating.  I want to know that.  I want to ask

25  that question too.  Okay.  Doctors in America should not be

1  afraid of treating patients with pain, and that's what I was

2  doing.  I was not part of the scheme or that family -- the

3  Nguyen family's scheme or what the Government accuse me of,

4  okay.  And for me in order to enrich myself for greed or

5  whatever they accuse me of $150 per patient visit, okay,

6  making less than out the total family less than $4,000, to

7  enrich that -- and to lose my career, my life, my license, and

8  the humiliation, and to make my family suffering, Judge, why

9  would I do that?  Okay.  Why would I intend to distribute

10 something that I know would harm the community?  This is from

11 the family that did that.  They even admitted that they came

12 and coached and planned all this stuff.  I was the victim.

13 Initially, I was the victim of all five, and then I became the

14 target of fraud and conspiracy of drug.  Okay.

15        So in this opioid crisis, as I'm aware of it, this

16 problem -- we need to work to address this problem working

17 together.  We need to solve this problem not using an innocent

18 physician like myself as a scapegoat.  Okay.  This is a matter

19 that the Government just want to target -- either -- I don't

20 know if for their money purpose or for advancement of their

21 career or some sort of ethnic cleansing of the medical

22 profession.

23        I beg you to go back and look at the evidence, which

24 I took the plea because I thought it would give me a chance to

25 move forward with my life, and I don't want -- but after

                    Sarah K. Mitchell, RPR, CRR

 1    hearing today, being sentenced for something I didn't do,

 2    didn't intend to fraud, didn't intend to sell drug or

 3    distribute drug, this really, really -- this really affect --

 4    I want the truth to be come out.  I'll no longer be afraid or

 5    no longer be intimidated by the Government any longer.  And

 6    I'm prepared for any retaliation or anything from the

 7    Government.  Okay.  And I just want to let you know that, and

 8    I just appreciate you for giving me this opportunity to speak

 9    now.  God bless you, and I want to say God bless America.

10    Thank you, sir.

11          THE COURT:  Thank you, sir.  All right.  He's

12    remanded.  Thank you, all.  We'll be in recess.

13          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

14        (The proceedings were concluded at 11:27 a.m.)

15

16

17

18

19

20

21

22

23

24

25

                         Sarah K. Mitchell, RPR, CRR

| | |
|---|---|
| 1 | REPORTER'S CERTIFICATE |
| 2 | |
| 3 | I, SARAH K. MITCHELL, Official Court Reporter for the |
| 4 | United States District Court for the District of Colorado, a |
| 5 | Registered Professional Reporter and Certified Realtime |
| 6 | Reporter, do hereby certify that I reported by machine |
| 7 | shorthand the proceedings contained herein at the time and |
| 8 | place aforementioned and that the foregoing pages constitute a |
| 9 | full, true and correct transcript. |
| 10 | Dated this 9th day of December, 2019. |
| 11 | |
| 12 | |
| 13 | |
| 14 | _____ /s/ Sarah K. Mitchell _____ |
| 15 | SARAH K. MITCHELL |
| | Official Court Reporter |
| 16 | Registered Professional Reporter |
| | Certified Realtime Reporter |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Sarah K. Mitchell, RPR, CRR